Filed 8/22/25  In re M.H. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

In re M.H. et al., Persons Coming Under
the Juvenile Court Law.

| | |
|---|---|
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E085308 |
| Plaintiff and Respondent, | (Super.Ct.No. DPRI2400420) |
| v. | OPINION |
| A.R., | |
| Defendant and Appellant. | |

In re R.T., a Person Coming Under the
Juvenile Court Law.

| | |
|---|---|
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E085320 |
| Plaintiff and Respondent, | (Super.Ct.No. DPRI2400418) |
| v. | |
| A.R., | |
| Defendant and Appellant. | |

1

In re K.G., a Person Coming Under the Juvenile Court Law.

| | |
|---|---|
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E085323 |
| Plaintiff and Respondent, | (Super.Ct.No. DPRI2400419) |
| v. | |
| A.R., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Dorothy McLaughlin, Judge.  Affirmed.

Paul A. Swiller, under appointment by the Court of Appeal, for Defendant and Appellant.

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Julie Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

Defendant and appellant A.R. appeals from the jurisdictional findings and dispositional orders declaring her son, R.T., and her three wards—K.G., Mark.H, and Mari.H.—dependents of the juvenile court under Welfare and Institutions Code section 300, subdivision (b), and ordering family maintenance services for her.[1]  Appellant argues that R.T.'s father, A.T., posed the sole risk of harm to the children and that, as a

---

[1]  Unlabeled statutory citations refer to the Welfare and Institutions code.

2

result, the record contains insufficient evidence to support the juvenile court's finding that she was an offending parent or guardian. We affirm.

## FACTUAL BACKGROUND

The following four minors (together, "the children") are the subjects of this consolidated appeal: (1) Nine-year-old R.T., who is appellant's biological son with her significant other, A.T.; (2) six-year-old K.G., who is appellant's maternal nephew and ward; (3) 10-year-old Mark.H., who is appellant's ward and A.T.'s maternal grandson; and (4) seven-year-old Mari.H, who is appellant's ward and A.T.'s maternal granddaughter.[2] Appellant is a social worker employed by the Riverside County Department of Public Social Services (DPSS).

On September 27, 2024, DPSS received a drug-endangered child referral alleging that appellant's boyfriend, A.T., had been arrested and that the police had seized cocaine and other contraband from A.T.'s home, where appellant and the children were staying. The social worker contacted the investigating detective, who told her that he had been surveilling A.T. for the past month. The detective said that he had waited for appellant and the children to leave A.T.'s home on the morning of September 26, 2024, before executing the search warrant. Inside a kitchen cabinet accessible to the children, the police found a loaded firearm, $34,000 in cash, and 250 grams of cocaine. The same day, A.T. was arrested for driving a stolen truck, inside of which the police found more

---

[2] We have consolidated A.R.'s appeals in the following three cases for purposes of briefing, oral argument, and decision: R.T.'s dependency proceeding (case No. E085320); K.G.'s dependency proceeding (case No. E085323); and the dependency proceeding for Mark.H and Mari.H (case No. E085308).

cocaine and digital scale bearing white residue. A.T. was affiliated with the Los Angeles criminal street gang " 'Rollin 40 Crips,' " but he claimed he was no longer an active member.

The social worker went to Mark.H.'s school to interview him, but the child declined to speak with her, saying that appellant had told him not to talk to social workers. The social worker then interviewed appellant at the home from which the contraband was seized. Appellant said that she and A.T. had been broken up for six months. She said that she and the children only visit A.T.'s home and that they sleep at her mother's home.

According to appellant, she first learned that A.T. used drugs a couple of weeks earlier, on September 10, 2024. Despite the fact that she originally said she and A.T. had been broken up for six months, appellant also told the social worker that discovering his drug use had been the "final straw" for her and that it made her no longer want "to stay in the home with [A.T.]" or "to continue their relationship." Regarding the contraband found in the home, appellant said that the cash belonged to her, A.T., and her sister, but that she did not know about the drugs or the firearm. She said that she keeps three guns in a safe in her closet.[3]

Appellant said she did not know that A.T.'s vehicle was stolen. She said that he worked as an auctioneer, and so she had assumed that he purchased the vehicle at an auction. Appellant submitted to a saliva drug test, which was negative. She denied

---

[3] As we discuss below, appellant later denied that any of the money found with the other contraband belonged to her.

needing services, and she promised that she would not help bail A.T. out of jail or allow the children to be in his home if he was to be released.

The social worker also interviewed appellant's mother, who had learned about A.T.'s arrest and the search warrant from her daughter the previous day. Appellant's mother said that she had never seen A.T. under the influence of drugs, and she confirmed appellant's statement that appellant and the children spend the night at her home.

After those interviews, the investigating detective informed the social worker that law enforcement had also seized a stolen trailer and two stolen jet skis from A.T.'s garage. The detective said that he was not currently viewing appellant as a subject of the investigation; but, it concerned him to learn that appellant had told the social worker that the money was partly hers because the money was stored in the cabinet along with the other contraband.

When the social worker asked appellant about the trailer and jet skis, she said that A.T. had acquired them the year before, and that she had " 'felt something was off' " but did not ask A.T. about it because she felt like "the less she knows, the better." When asked how she could know about the money but not the cocaine or firearm in the kitchen cabinet, appellant clarified that the money she had been referring to was her own $10,000 in cash, which she kept in a zippered pouch elsewhere in the home. The social worker observed that the home "was filled with personal belongings for the children and [appellant], suggesting they are in the home often."

The social worker then interviewed A.T. while he was in custody. As part of the criminal investigation, A.T. had already told law enforcement that appellant and the

children lived with him in the home where the contraband was found.  During his interview with the social worker, he said that he and appellant had been together for nine years and were still in an active relationship.  He denied working at an auction and said that he did not have a job because he did not want to pay child support.

Regarding the criminal charges against him, A.T. said that on September 25, 2024, he was at his " 'side piece's' " home when they got into an argument, and he left.  He took his cocaine, firearm, and cash back with him to the home he shared with appellant and the children, and he put the items in the kitchen cabinet.  That evening, he slept downstairs while appellant and the children slept upstairs.

A.T. said that appellant did not know about the contraband.  He denied selling cocaine and maintained that the large amount of the drug found at his home was for personal use.  He said that he had purchased half a pound of cocaine on September 23, 2024, because it was such a " 'good deal.' "

A.T. said that he had been using cocaine since he was 18 years old, and that he consumes seven grams of cocaine every day, along with marijuana.  He said that he used a scale to weigh his purchases and to ensure that he is using no more than seven grams a day because he is "scared he will overdose in the home and the children and [appellant] would find him."

He said that appellant learned of his drug use on September 10, 2024, "when law enforcement called her to come pick up the truck."  He said that after September 10, appellant and the children continued to sleep at his home three times a week, and that he

6

sometimes picked the children up from school and let them stay at his home until appellant returned from work.

A.T. said that appellant, his mother, and appellant's mother were all actively working to bail him out of jail. He agreed that if he were released he would participate in services and stay with his mother pending the investigation.

On October 1, 2024, DPSS took the children into protective custody and placed them with appellant's mother. The following day, DPSS filed dependency petitions on behalf of the children, alleging that they come within the meaning of section 300, subdivision (b), due to A.T.'s drug use and criminal activity and appellant's failure to protect them from the risk A.T.'s conduct posed. The petitions contained a b-1 allegation concerning appellant and a b-2 allegation concerning the contraband found at the home. The b-1 allegation stated that appellant knew or reasonably should have known "that her significant other was abusing controlled substances . . . and failed to intervene and protect the children." The allegation also stated that appellant placed the children at risk of harm because she allowed A.T. to be around the children and "transport [them] home from school," despite knowing that A.T. had been "cited for possession of cocaine residue on or about September 10, 2024." The b-2 allegation stated that the children were at risk of substantial harm because the police found cocaine, a loaded firearm, and $34,000 in cash at "the family home" in "a lower kitchen cabinet accessible to the children." In addition, R.T.'s petition contained a b-3 allegation stating that the child's father had a drug-related criminal history that included an arrest on September 10, 2024, for possession of cocaine

residue and an arrest on September 24, 2024, on charges related to the drugs, firearm, cash, and stolen vehicles found at his home.

On the advice of her attorney, appellant declined to speak with the social worker for the jurisdiction and disposition report.

The contested jurisdiction and disposition hearings for the children took place on November 18 and 27, 2024. Appellant provided the same stipulated testimony at each of the hearings. She testified that she was currently employed as a social worker for DPSS; that she is familiar with a safety plan; and that—as soon as she became aware of A.T.'s drug use on September 10, 2024—she implemented a safety plan requiring her to (1) not leave the children alone in his care, (2) not allow him to "drive the children alone," and (3) obtain childcare and transportation help from her neighbor and from her mother.

The juvenile court sustained the allegations in the petitions, found that the children came within subdivision (b) of section 300, declared them dependents, and ordered family maintenance services for appellant. The court explained that its ruling came down to a credibility contest between appellant and A.T. and that, based on "the totality of the information that is before the court," the court found that appellant was aware of the risk that A.T.'s conduct posed to the children and failed to protect them from that risk.

## DISCUSSION

Appellant challenges the sufficiency of the evidence to support the b-1 jurisdictional finding only. "The general rule is that 'the juvenile court's exercise of jurisdiction over a child will be upheld if substantial evidence supports any one of the statutory bases for jurisdiction enumerated in the petition.' " (*In re M.R.* (2017)

8

7 Cal.App.5th 886, 896.)  Appellant does not challenge the b-2 jurisdictional finding regarding the contraband found in the family home, and that finding is "independently sufficient to justify the juvenile court's exercise of jurisdiction over [the children]." (*Ibid.*)  In such circumstances, it is nevertheless appropriate to reach the merits of the jurisdictional challenge "in three situations:  (1) the jurisdictional finding serves as the basis for dispositional orders that are also challenged on appeal; (2) the findings could be prejudicial to the appellant or could impact the current or any future dependency proceedings; and (3) the finding could have consequences for the appellant beyond jurisdiction." (*In re A.R.* (2014) 228 Cal.App.4th 1146, 1150.)  Because the b-1 jurisdictional finding serves as the basis of the dispositional order that appellant also challenges, we address the merits of her challenge to that finding.

Section 300, subdivision (b)(1), allows the juvenile court to assert jurisdiction when a "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of" a parent's or legal guardian's failure or inability "to adequately supervise or protect the child." (§ 300, subd. (b)(1)(A).)  A jurisdictional finding under section 300, subdivision (b)(1), requires that DPSS prove by a preponderance of the evidence the following elements:  "(1) neglectful conduct, failure, or inability by the parent; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness." (*In re L.W.* (2019) 32 Cal.App.5th 840, 848.)  The child must be subject to a defined risk of harm at the time of the jurisdiction hearing.  (*In re Roger S.* (2018) 31 Cal.App.5th 572, 582; *In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1389, abrogated on another ground in *In re R.T.* (2017)

3 Cal.5th 622, 628-630 (*R.T.*).) The juvenile court " 'need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child.' " (*In re J.A.* (2020) 47 Cal.App.5th 1036, 1048.)

" 'In reviewing the jurisdictional findings and the disposition, we look to see if substantial evidence, contradicted or uncontradicted, supports them.' " (*R.T.*, *supra*, 3 Cal.5th at p. 633.) " 'In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' " (*Ibid.*)

Appellant contends that the record lacks sufficient evidence to support the b-1 jurisdictional finding because the only evidence that she allowed A.T. access to the children after she learned of his drug use was "one statement [A.T.] purportedly made while in jail." But as just noted, issues of fact and credibility are the province of the trial court, and appellant's argument ignores that basic principle of substantial evidence review. Because it is the juvenile court's role to weigh the evidence and assess credibility, the juvenile court was entitled to credit A.T.'s statement about how often he saw the children and in what capacity. The juvenile court was also entitled to give little or no weight to appellant's stipulated testimony that she kept the children away from A.T. after she learned of his drug use. (See, e.g., *In re Casey D.* (1999) 70 Cal.App.4th 38, 52 ["It is the trial court's role to assess the credibility of the various witnesses, to weigh the evidence to resolve the conflicts in the evidence."], overruled in part on other grounds by *In re Caden C.* (2021) 11 Cal.5th 614, 636.) As a reviewing court, we must accept the

10

juvenile court's assessment of the evidence so long as it is not arbitrary or unreasonable. Here, the juvenile court made clear that its decision came down to a "credibility determination of two individuals." The court's decision to credit A.T.'s statements over appellant's testimony was reasonable because, unlike appellant, A.T. had no motive to downplay for the social worker his interaction with the children. Moreover, and as the juvenile court noted, appellant made statements to the social worker early on in the investigation that damaged her credibility. For example, appellant initially told the social worker that she and A.T. had been broken up for six months but, in the same interview, she also said that learning of his drug use a couple of weeks earlier made her want to end their relationship. The court reasonably concluded that these statements were contradictory. In addition, appellant admitted that she ignored her own concerns that A.T. might be engaged in criminal conduct because she believed that "the less she knows, the better." The juvenile court identified that statement as one of the reasons that it did not find appellant credible, and reasonably so. Such a denial-based approach to A.T.'s conduct was not protective of the children.

To challenge the credibility of A.T.'s statements to the social worker, appellant relies on A.T.'s counsel's statements during closing argument at R.T.'s jurisdictional hearing. Specifically, appellant cites A.T.'s counsel's statement that it was his client's actions, alone, "that put the family in the situation." According to counsel's argument, A.T. was "adamant" that appellant "did not know about his drug use, had no knowledge of any firearm, any vehicle" and that they were "living separate" because A.T. "was downstairs" and "[appellant] and the children were upstairs." However, "[i]t is axiomatic

11

that the unsworn statements of counsel are not evidence."  (*In re Zeth S.* (2003) 31 Cal.4th 396, 413, fn. 11; see Rules Prof. Conduct, rule 3.4(g) [attorneys must not "assert personal knowledge of facts at issue except when testifying as a witness"].)  Counsel's statements have no bearing on our review of the sufficiency of the evidence because those statements were provided in the form of argument, not testimony.

In any event, A.T.'s interview statement is not, as appellant contends, the only evidence that she allowed A.T. to have access to the children after she learned of his drug use.  The investigating detective told the social worker that he saw appellant and the children leave A.T.'s home as he was waiting to execute the search warrant on the morning of September 26, 2024.  From that evidence, the court could reasonably infer that appellant was minimizing the extent of her relationship with A.T. and the extent to which he had access to the children.

Appellant's assertions that A.T. had a "secret life" she knew nothing about and that "she was unaware that [A.T.] used drugs" are not supported by the record.  Appellant admitted that she discovered A.T.'s drug use on September 10, 2024.  She also admitted that she was suspicious of A.T.'s behavior but that she never acted on her intuition that "something was off" because she did not want to find out what that something was.  Those statements are at odds with a claim that she had no knowledge of the risk that A.T. posed to the children.

Finally, appellant argues that even if everything alleged in the b-1 allegation were true, there was no evidence that the children were *currently* at a risk of harm because, by the time of the jurisdiction hearing, she no longer lived with A.T., was participating in

12

parenting classes, and had tested negative for drugs.  But, as also noted above, the juvenile court need not wait until the children are seriously harmed to assume jurisdiction and take steps necessary to protect them.  (*In re J.A.*, *supra*, 47 Cal.App.5th at p. 1048.) "Evidence of past conduct may be probative of current conditions."  (*In re D.L.* (2018) 22 Cal.App.5th 1142, 1146.)  In terms of past conduct, appellant allowed her children to live with a person who consumed cocaine daily and kept large amounts of the drug at the home.  Given how much cocaine A.T. was consuming each day, it is difficult to imagine how appellant was not aware of his drug use before September 10, 2024.  But, even if the court credited appellant's statement about not discovering the drug use until several days before the search warrant, there is still substantial evidence in the record that appellant continued to stay at A.T.'s home with the children in the days leading up to the search warrant.  As for current conduct, even if appellant did not know about the dangerous contraband A.T. kept at their home until DPSS started its investigation, during that investigation she attempted to downplay her relationship with him and the access he had to the children.  Based on appellant's past and current conduct, the juvenile court could reasonably conclude that the children were at a current risk of harm due to her failure to protect them.  We therefore conclude that substantial evidence supports the juvenile court's b-1 jurisdictional finding.

DISPOSTION

We affirm the jurisdictional and dispositional findings and orders of November 27, 2024 in the consolidated cases.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS_____
J.

We concur:


CODRINGTON_____
Acting P. J.


RAPHAEL_____
J.

14